UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANNE WITTMANN                                    CIVIL ACTION

v.                                               NO. 17-9501

UNUM LIFE INSURANCE                              SECTION "F"
COMPANY OF AMERICA

ORDER AND REASONS

Before the Court are cross motions for summary judgment. For the reasons that follow, the plaintiff's motion for summary judgment is DENIED, and the defendant's motion for summary judgment is GRANTED.

**Background**

Anne Wittmann is a participant to a long-term disability insurance plan through her employment as an attorney with Baker, Donelson, Bearman, Caldwell, Berkowitz PC. Unum Life Insurance Company of America serves as both the administrator and underwriter of the Plan. On April 7, 2014, Wittmann filed a claim for disability benefits under the Plan, asserting that she had been unable to work since December 31, 2013.[1]

_____

[1] The Plan defines "disability" as follows:

> You are disabled when Unum determines that due to your **sickness or injury**:
> 1. You are unable to perform the **material and substantial duties** of your **regular occupation** and are not working in your regular occupation or any other occupation
> . . .
> You must be under the regular care of a physician in order to be considered disabled.

1

In filing this claim, Wittmann described her medical condition as "unknown – other than fibromyalgia and pericarditis," and identified her first symptoms as "chest pain, SOB, muscle/joint pain, fatigue, lightheaded." When asked what "specific duties" of her occupation she was unable to perform, she stated that she was "unable to concentrate" and that her "physical endurance [wa]s limited due to pain and fatigue." In addition, she listed her treating physicians as: Dr. Frank Cruz, Internal Medicine/Nephrology; Dr. William Davis, Rheumatologist; Dr. Robert Lizana, Chiropractor; Dr. Robert Kelly, Physician; and Dr. Charles

---

The Plan further itemizes information that a claimant must submit in order to establish such a disability.

> Proof of your claim, provided at your own expense, must show:
> - the date your disability began;
> - the existence and cause of your sickness or injury;
> - that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation;
> - that you are under the **regular care** of a **physician** . . . ."

In addition, the Plan vests Unum with "**discretionary authority** to make **benefit determinations** under the Plan." (emphasis added). Such "[b]enefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." The Plan further provides that "[a]ll benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim."

Chester, Psychiatrist. Unum acknowledged receipt of Wittmann's claim on April 7, 2014.

Soon after, an Attending Physician's Statement dated April 15, 2014 was submitted by Dr. Cruz, Wittmann's internist. He noted that Wittmann had "an as-yet undiagnosed entity characterized by fatigue, muscle and joint aches, tightness in the chest, Raynaud's phenomenon and, most recently, by cognitive dysfunction." He further reported that Wittmann had seen various doctors in New Orleans and been evaluated by three different subspecialties at the Mayo Clinic. In response to Unum's query about Wittmann's physical and behavioral health restrictions and/or limitations, Dr. Cruz stated: "As of this time she is unable to perform her usual job. I am not able to predict when she may resume usual employment."

Information was also submitted by Wittmann's employer regarding her job description and duties as an attorney. It was noted that an attorney at Baker Donelson must possess the following skills and abilities:

1. Ability to concentrate and pay close attention to detail for up to 100% of work time.
2. Analytical skills necessary to conduct complex and detailed analysis of legal matters.
   . . .
6. Work requires more than 40 hours per week to perform the essential duties of the position.
7. Must be able to maintain regular attendance to meet client and Firm's needs.

Based upon this information, Unum concluded that Wittmann's occupation was "performed at a sedentary exertional demand level and require[d] frequent concentration/attention to detail/focus and multi-tasking."

Unum next conducted an initial telephone interview with Wittmann on April 29, 2014. Wittmann advised that she had been diagnosed with pericarditis in November of 2012, after which she began to experience "horrible fatigue and muscle and joint pain." She further reported that, some days, the pain was so great that she could not get up and that she did not get out of bed the day before the interview.

Thereafter, Unum obtained Wittmann's medical records from her treating physicians. These records were initially reviewed by Nora Gregory, a registered nurse, on July 28, 2014. Gregory noted that Wittmann had undergone an extensive workup at the Mayo Clinic in February of 2013, during which Dr. Timothy Niewold, a rheumatologist, reported: "While she has a number of tender points, I am not completely convinced of a diagnosis of fibromyalgia." Gregory also noted that Wittmann had seen a pulmonologist, cardiologist, and gastroenterologist with no significant abnormalities noted. She also reviewed records submitted by Dr. Davis, Wittmann's treating rheumatologist, who noted diagnoses of fibromyalgia, arthralgia, Raynaud phenomenon, and celiac disease. Ms. Gregory noted that Dr. Davis did not specifically mention

examining tender points to evaluate a possible diagnosis of fibromyalgia, but rather, stated that Wittmann "exhibits tenderness" and was "tender over all myofascial trigger points."[2]

Records from Dr. Chester, Wittmann's psychiatrist, were also reviewed. Wittmann saw Dr. Chester regularly for her Attention Deficit Disorder, which he treated with Adderall. An office visit note dated May 7, 2014 indicated that Wittmann complained of fatigue, joint pain, and muscle spasms, and that Dr. Chester recommended Wellbutrin, Elavil, or Pamelor. Ms. Gregory also reviewed records from the office of Dr. Robert Lizana and Dr. Robert Kelly. These notes reflected that Wittmann was treated for chest pain and "all over muscle pain."

On July 31, 2014, Unum wrote to Dr. Davis to request clarification regarding Wittmann's functional capacity as an attorney. When asked whether Wittmann was able to perform the occupational demands of her job on a full-time basis, Dr. Davis stated that he was "uncertain." However, he went to explain that "she has chronic pain and fatigue that likely impair her ability to focus for 8 hours on complicated issues."

---

[2] Ms. Gregory did not, however, review the April 24, 2013 report submitted by Dr. Austin Fraser, a resident who practices in Dr. Davis's office. After examining Wittmann, Dr. Fraser reported that she exhibited tenderness over all 18 tender points ("Fibromuscular exam: 18/18"). He further noted that Wittmann "[a]ppears to have fibromyalgia."

In addition, Dr. Tony Smith, an Unum physician board certified in Family Medicine, attempted to contact Dr. Cruz in August of 2014 to discuss Wittmann's condition. After several failed attempts to reach Dr. Cruz by telephone, Dr. Smith wrote to him on August 4, 2014, inquiring as to what medical conditions precluded Wittmann from returning to work full-time. By letter dated August 21, 2014, Unum advised Wittmann that it would pay benefits under a reservation of rights pending further evaluation of her claim; at that time, Unum was still attempting to contact Dr. Cruz and Dr. Davis for clarification regarding Wittmann's functional capacity.[3]

On September 12, 2014, Dr. Davis responded to additional questions posed by Unum's Dr. Smith. Dr. Davis stated that Wittmann's fatigue and pain precluded her return to work but indicated that he had placed no work restrictions on her and was unaware of any objective data supporting her alleged cognitive deficits. Specifically, Dr. Davis answered the questions as follows:

> **Q:** Are you currently giving Ms. Wittmann any specific work restrictions?
> **A:** No.

---

[3] Although the record does not reflect the contents of the communication between Dr. Smith and Dr. Cruz, the record does contain notes submitted by Dr. Cruz concerning Dr. Smith's efforts to reach him. In those notes, Dr. Cruz remarks that "the problem is also cognitive."

**Q:** What medical condition(s) is currently precluding Ms. Wittmann from returning to work full time?
**A:** Severe fatigue with intermittent lightheadedness, diffuse musculoskeletal pain and tenderness.

**Q:** What is the medical etiology for the reported pain and fatigue?
**A:** Unknown – carries descriptive diagnoses of fibromyalgia and chronic fatigue.

**Q:** Please discuss/list if applicable, the medical data currently available that supports the reported cognitive deficits.
**A:** I am not aware of objective data or neurological testing – cognitive problems are patient reported.

**Q:** Please indicate the time period in which you plan to release Ms. Wittmann to return to work full time.
**A:** N/A. Consider functional capacity assessment and neuropsych testing.

Dr. Smith then conducted a medical review of Wittmann's file on September 24, 2014. He noted that Wittmann had undergone extensive medical evaluations and that no significant abnormalities had been identified. He further noted that it was unclear why she remained off work and indicated that he could find no medical data within the available medical records to support cognitive deficits. Ultimately, Dr. Smith concluded that the restrictions and limitations noted by Wittmann's treating physicians were not supported by the medical records before him, which revealed no physical or cognitive deficits.

Because of the disagreement between Dr. Smith, Unum's physician, and Dr. Cruz, Wittmann's internist, as to whether medical limitations precluded Wittmann from working, Unum referred

the file to another of its consulting physicians, Dr. James Bress. After conducting his own review of the file, Dr. Bress, who is board certified in internal medicine, agreed that there was no support in the medical records that any restrictions or limitations prevented Wittmann from being able to perform the duties of her occupation. He noted that, despite Dr. Cruz's statement that Wittmann suffered from cognitive impairment, there was no evidence in the medical records of cognitive testing. He further mentioned that the medical records from Wittmann's treating physicians did not contain evidence describing tender point testing of specific areas to support a diagnosis of fibromyalgia, and that Dr. Davis provided no restrictions or limitations.

By letter dated October 3, 2014, Unum denied Wittmann's claim for long-term disability benefits because it had determined that she was able to perform the duties of her occupation as an attorney. In providing Wittmann with "Information That Supports Our Decision," Unum's October 3, 2014 claim denial letter states:

> To assist us in our evaluation we obtained records from Dr. William Davis, Dr. Robert Lizana/Dr. Robert Kelly, Dr. Charles Chester, Dr. Frank Cruz, and the Mayo Clinic.
> • • •
> It has been medically opined that you have undergone an extensive medical evaluation and testing to date with no significant abnormalities identified. Further, it is opined that no medical data within the currently available records supports cognitive deficits.
>
> We asked a physician, board-certified in family medicine, to review your file. The physician concluded that your records do not support Dr. Cruz's opinion that

you are unable to work . . . . Since the physician did
not agree with Dr. Cruz's opinion about your functional
capacity, the physician contacted Dr. Cruz to gain a
better understanding of his opinion. Despite their
communication, the reviewing physician and Dr. Cruz were
not able to reach an agreement about the extent of your
functional capacity.

At that time, in order to obtain a second opinion, a
physician board-certified in internal medicine reviewed
your file. The second reviewing physician agreed with
the conclusion of the first reviewing physician about
your functional capacity. The following was observed:

- You have undergone an extensive medical evaluation
  and testing to date with no significant
  abnormalities identified.

                          . . .

- There has been no evidence of any tender point
  testing to support a diagnosis of Fibromyalgia.
  All testing has been normal. There has been no
  evidence of pain behavior during any office visits.

That letter also advised Wittmann of her right to request an

appeal, which she exercised on January 26, 2015. In her appeal

letter, Wittmann noted that Unum overlooked evidence of tender

point testing submitted by Dr. Davis and Dr. Lizana, and

misconstrued Dr. Davis's responses to Dr. Smith's questions.

Wittmann also stated that she did not dispute that she could engage

in sedentary employment; however, she asserted that she was unable

to focus and concentrate due to her fatigue and pain. Finally,

Wittmann submitted a letter dated December 10, 2014 from Dr.

Chester, her psychiatrist. Dr. Chester stated that Wittmann had

been diagnosed with fibromyalgia, which caused chronic fatigue and

pain, and impacted her ability to concentrate and remember details.

Dr. Chester went on to conclude: "I do not believe she has the

capacity to function in her job as a lawyer because of the fatigue, the pain, and the lack of ability to concentrate."

On April 4, 2015, Dr. Chris Bartlett, an Unum consultant board certified in family medicine, conducted an "appeal review" of Wittmann's file. Dr. Bartlett noted that Wittmann "may or may not have Fibromyalgia, but available data does not support functional impairment from her fatigue, pain, and concentration/memory problems." He further stated:

> Regardless of the presence or absence of FMS, however, the insured's functional capacity is what matters. FMS is not in and of itself necessarily a disabling diagnosis and many people with FMS work full-time, controlling their symptoms with exercise and medications.

As to Wittmann's functional capacity, Dr. Bartlett noted that the "treating physicians' opinions [regarding] lack of full-time sedentary work capacity were overly restrictive based on the results of physical exams and the absence of data or testing showing impairment from fatigue, weakness or cognitive deficits." He further noted that Wittmann had brought over 100 pages of medical information with her to the Mayo Clinic, which she was able to discuss with the specialists, and that she was able to draft a detailed, extensive appeal letter. Dr. Bartlett also reached out to Dr. Chester to share his opinion that the medical records did not support a conclusion that Wittmann's fatigue, memory, focus, or cognitive problems precluded her full-time work capacity as an attorney. In response, Dr. Chester reported a

diagnosis of Somatic Symptom Disorder with predominant pain, persistent and opined that Wittmann did not retain functional capacity for full-time work as an attorney. Dr. Chester explained that her functional capacity was significantly impacted by physical problems and psychological sequalae (especially lack of focus), and he offered to order neuropsychological testing. Dr. Bartlett concluded that the new information provided by Dr. Chester did not change his prior opinion that the medical records contained no documentation of observed cognitive problems that would preclude functional capacity for full time work as an attorney.

By letter dated May 29, 2015, Unum advised Wittmann that it was upholding its determination that she was not entitled to benefits. In summarizing Wittmann's medical records, Unum remarked that her "reports of pain, fatigue, and cognitive difficulty [we]re out of proportion to the physical exams, physician observations, diagnostic tests, and lab studies available for [] review." Unum further stated that she may have fibromyalgia based upon her reports of widespread unexplained pain but that the relevant question was whether her sickness caused her to have limitations on her functioning and restrictions on her activities. According to Unum, physicians at the Mayo Clinic and other local specialists had documented no observed fatigue, confusion, or cognitive problems and described her as being "cheerful," looking "healthy," and being "very comfortable." Unum

further explained that, because the available medical records did not contain objective documentation of cognitive problems, it could not conclude that memory, focus, or other cognitive issues precluded her from performing her occupation as an attorney. Unum also stated that, "[w]hile there is no definitive test for the presence or absence of fibromyalgia, there is neuropsychiatric testing which can quantify both cognitive deficits and the presence or absence of psychiatric conditions." Because Wittmann indicated that she had undergone neuropsychological testing, Unum advised that it would consider additional information if submitted by June 25, 2015.

Unum subsequently received correspondence from Wittmann on June 22, 2015, enclosing the following information: (1) a neuropsychological evaluation performed by Dr. Michael Chafetz, Ph.D in Neuropsychology; (2) the results of a sleep study; and (3) a printout of an Aquatic Home Exercise Program provided by Ochsner. After performing neuropsychological testing, Dr. Chafetz noted the follow impressions:

> Anne Wittmann is a 55 year old attorney referred for evaluation for a recent history of memory, confusion, and word finding problems . . . . She has been diagnosed with fibromyalgia, and she has a prior diagnosis of ADHD for which she has been treated. The current neuropsychological findings show generally intact abilities but are highly variable even within domains. For example, she is showing widely varying attentional abilities, but she demonstrates strong attention and concentration on tasks that have a high requirement for sustained attention and concentration. Her executive

abilities and problem solving are strong, and she is showing quick and agile processing speed. Her memory processes are again variable, but she is not showing memory dysfunction. Language and reading abilities are generally strong and at expected levels. She does not have pronounced deficits in any neurocognitive domain. While she is showing occasional attentional lapses, or cognitive inefficiencies, these may be at least in part attributable to a prior history of ADHD that is primarily attentional in nature. However, she is also fatigued, and is suffering from depression and poor sleep. The poor sleep itself likely exacerbates her pain condition and her depressive symptomology, making her more distractible. In this, she is likely in a negative spiral. **Her reported memory and concentration problems, and problems with "disconnecting" are not borne out by testing or a history of neuropathology.**

Emphasis added. Dr. Chafetz concluded by listing the following diagnostic considerations: History of ADHD, Insomnia, Depressive Disorder, History of Fibromyalgia, Neck Injury and Surgery, Chronic Fatigue.

Dr. Bartlett reviewed this new information but stated that it did not change his opinion regarding Wittmann's capacity to perform her occupation as an attorney. He also noted that the diagnoses of depression and Somatic Symptom Disorder, as described by Dr. Chester, would be reviewed by Dr. Jana Zimmerman, Unum's psychologist. In reviewing Wittmann's file on July 13, 2015, Dr. Zimmerman concluded that "the totality of the information indicated a psychological contribution inclusive of depression and somatic focus but not impairment as of 10/3/14 and beyond." She noted that, as reported by Dr. Chafetz, the neuropsychological

test results did not support Wittmann's reported memory and concentration problems.

By letter dated July 20, 2015, Unum informed Wittmann that it was again upholding its decision because the "results d[id] not support reported memory and concentration problems and/or problems with disconnection or a history of neuropathology as Dr. Chafetz explained." That letter also advised:

> Unum Life Insurance Company of America has completed our review of your appeal. No further review is available and your appeal is now closed.
>                          . . .
>
> If you disagree with this decision, you have a right to bring a civil suit under section 502(a) of the Employee Retirement Income Security Act of 1974.

On October 24, 2016, before filing suit, Wittmann submitted to Unum a disability determination by the Social Security Administration and invited Unum to reconsider its decision once again. Enclosed with the letter was correspondence from the SSA dated October 3, 2015, informing Wittmann of her entitlement to Social Security Disability Income benefits. Although the SSA correspondence did not explain the basis for the SSA award, Wittmann provided Unum with a copy of a Consultative Psychological Evaluation Report prepared by board-certified psychologist, Dr. William Fowler, in connection with her claim for SSDI benefits. Dr. Fowler's report summarized Wittmann's self-reported complaints

of muscle and joint pain, fatigue, and forgetfulness. In terms of Wittmann's mood, Dr. Fowler stated:

> She reports that her doctors tell her that she is depressed although she does not feel depressed. She reports limited energy however. There are reportedly days that she makes herself get out of bed and then sits down and cannot seem to get up from the chair. She reportedly sometimes starts but cannot bring herself to finish tasks. She denies crying spells. She does report impaired attention and concentration. She rates her current depression as a 5 or 6/10. She does present as dysphoric and worrisome today.

Dr. Fowler further noted:

> She does report some periods of forgetfulness and confusion but today shows fairly good ability to carry out cognitive tasks of memory, although some focus and persistent issues are noted. She does show what is likely some decline in attention and concentration. **Persistence appears shortened and pace is slow. Given the cognitive demands of her profession, it does seem that she would currently have some difficulty performing work related tasks, including ability to focus, read, retain, analyze, and recall information. Complaints of lowered energy, pain, and fibromyalgia may render her unable to perform even simple job tasks in a stable, reliable manner.**

Emphasis added. Dr. Fowler concluded by noting the following diagnostic impressions:

> Major Depressive Episode
> Anxiety NOS
> Rule out pseudo dementia secondary to depression

On October 31, 2016, Unum advised that it would consider the new information provided. Thereafter, Unum made several attempts to obtain the SSA file but ultimately never received it. After reviewing Dr. Fowler's report on January 17, 2017, Dr. Zimmerman

maintained her opinion that the evidence indicated a psychological contribution but not impairment. She noted that Dr. Fowler did not mention reviewing Wittmann's medical records or the neuropsychological test results from Dr. Chaftez. She further noted that the limited information available to Dr. Fowler was not sufficient to support his "psychiatric diagnostic impressions or [for him to] rule in or out cognitive impairment from pseudo-dementia or any other [behavioral health] or physical etiology."

By letter dated January 24, 2017, Unum granted Wittmann mental illness disability benefits from June 30, 2014 through June 30, 2016 and stated that it would investigate further to determine her entitlement to benefits beyond 24 months for a disability unrelated to mental illness.[4] Unum explained its decision to Wittmann's attorney as follows:

> You supplied a copy of your client's Social Security Disability award letter dated October 3, 2015, and a copy of the independent exam with Dr. Fowler, psychologist. Dr. Fowler noted Major Depressive

---

[4] Pursuant to the Plan, benefits are payable through the earliest of the participant's expected retirement date or the cessation of the disability. However, "[t]he lifetime cumulative maximum benefit period for all disabilities due to **mental illness** is 24 months."

The Plan defines "mental illness" as
> a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual or Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress.

Episodes, Anxiety NOS and rule out pseudo-dementia secondary to depression. As you know, we have not received a copy of her Social Security claim file as requested.

In giving significant weight to the Social Security Administrator's finding of disability, we have determined benefits are payable through June 30, 2015 for Ms. Wittman's mental illness disability.

In response, Wittmann's attorney advised Unum that Wittmann had not made a claim for a disability due to mental illness and that the reports of Dr. Fowler and Dr. Chafetz did not support the existence of an impairing psychiatric condition. The letter also indicated that Wittmann would provide updated medical records. On May 12, 2017, Dr. Chester, Wittmann's psychiatrist, submitted updated records, along with a cover sheet stating: "FYI: I hope you are also getting info from ALL HER OTHER MD'S." Among the records submitted by Dr. Chester include a May 22, 2015 office visit note in which he opined that Dr. Chafetz's neuropsychological testing would "probably not help her to be 'disabled'" and a July 20, 2016 note in which he reported: "Fatigue is worse. Still in a lot of pain. She sleeps all the time." Unum also received a letter from Susan Costa, Wittmann's massage therapist, who reported that Wittmann's muscles "are contracted from head to toe" and that the "fascia is thick and congested," which "is consistent with a client that would have an acute muscle injury or chronic muscle instability."

To further assess Wittmann's alleged inability to work due to a physical condition, Unum retained Hub Enterprises, Inc. to surveil Wittmann on Wednesday, July 12, 2017 and Thursday, July 13, 2017 from the early morning through the afternoon hours. According to the investigator's report, Wittmann was observed receiving a package from a delivery person while standing in her doorway and walking onto her patio to move furniture pillows. It was also noted that Wittmann did not leave her residence during either surveillance period.

The updated information was reviewed by Dr. Smith on July 25, 2017 and Dr. Bress on July 29, 2017. Both physicians concluded that the updated records did not support specific functional or cognitive defects or lack of full-time sedentary work capacity. By letter dated July 31, 2017, Unum notified Wittmann's attorney that Wittmann was not entitled to additional benefits because there was "no evidence for any physical/organic medical problems which would preclude full-time Sedentary work from June 30, 2016 to the present." This letter did not discuss the results of Unum's surveillance.

On September 22, 2017, Wittmann sued Unum for the denial of her claim for physical disability benefits under her long-term disability plan, pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Act of 1974. 29 U.S.C. § 1132(a)(1)(B). Four months later, by letter dated February 25, 2018, Wittmann's counsel

requested an administrative appeal of Unum's July 2017 decision. Because the request was made within the requisite 180-day appeal period, Unum agreed to consider the appeal; it then filed a motion to dismiss this lawsuit for failure to exhaust administrative remedies, or in the alternative, to stay the proceedings pending the exhaustion of administrative remedies. Before the Court had the opportunity to consider that motion, Unum completed its administrative review, rendering the motion moot.[5]

Several months later, Wittmann moved to strike from the administrative record all documents generated after her complaint was filed on September 22, 2017, and Unum moved for partial summary judgment that all documents associated with Wittmann's post-litigation administrative appeal are part of the administrative record, or in the alternative, for summary judgment dismissing Wittmann's suit for failure to exhaust administrative remedies. In granting Wittmann's motion and denying Unum's, this Court stated that Wittmann exhausted her administrative remedies as of July 20, 2015, and that no documents generated after September 22, 2017 would be considered in determining whether Unum abused its

---

[5] In considering the post-lawsuit administrative appeal, Unum retained an independent rheumatologist to review new medical information submitted by Wittmann. Thereafter, Unum upheld its determination that Wittmann was not entitled to benefits exceeding 24 months for a disability unrelated to mental illness.

discretion in denying her claim for long-term disability benefits.
See Order & Reasons dtd. 10/31/18.

Thereafter, Wittmann moved to supplement the administrative record with the Unum Benefits Center Claims Manual and for summary judgment that Unum acted arbitrarily and capriciously in denying her claim for long-term disability benefits, such that she is entitled to an award of benefits, as well as attorney's fees and costs.  Not to be outdone, Unum filed its own motion for summary judgment on the administrative record and moved to strike the expert report of Dr. Davis, as well as all other exhibits not contained within the administrative record, and to remove this matter from the Court's trial docket to be decided on the parties' briefs.  In response, on November 30, 2018, the Court removed this matter from its trial docket to be decided upon the parties' cross-motions for summary judgment.

Most recently, in its Order and Reasons dated December 13, 2018, this Court granted Wittmann's motion to supplement the administrative record with the Unum Benefits Center Claims Manual and denied Unum's motion to strike.  In so doing, the Court reasoned that the Claims Manual properly forms part of the administrative record because Unum had access to and an opportunity to consider its own manual during its pre-litigation review of Wittmann's claim, that Dr. Davis's report would assist the court in understanding medical terms and procedures contained within

administrative record, and that all other exhibits highlighted by Wittmann fall within at least one of the five exceptions to the general rule that judicial review in an ERISA action is limited to the administrative record.  The Court also set forth a briefing schedule for the parties' cross-motions for summary judgment and ordered Wittmann to submit supplemental briefing as to how the admission of the Claims Manual, training documents, and Dr. Davis's expert report impacts the analysis of whether Unum abused its discretion in denying her claim for long-term disability benefits.

Both sides have submitted supplemental memorandum in support of their respective positions, and the Court now considers their cross-motions for summary relief.

I.

A.

"Standard summary judgment rules control in ERISA cases." Ramirez v. United of Omaha Life Ins. Co., 872 F.3d 721, 725 (5th Cir. 2017) (citations omitted).  Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

*B.*

ERISA confers jurisdiction on federal courts to review benefit determinations by fiduciaries or plan administrators. 29 U.S.C. § 1132(a)(1)(B). In other words, section 1132 of ERISA gives a plan participant standing to bring suit in federal district court "to recover benefits due . . . under the terms of [the] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." Id.

The standard of judicial review afforded benefits determinations depends upon whether a plan administrator is vested with discretionary authority. Courts generally review benefit determinations *de novo*. See Firestone Tire & Rubber Co. v. Bruch,

489 U.S. 101, 115 (1989); Conkright v. Frommert, 559 U.S. 506, 512 (2010). But "[w]hen an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." Ariana M. v. Humana Health Plan of Tex., Inc., 884 F.3d 246 (5th Cir. 2018) (en banc); see Anderson v. Cytec Indus., Inc., 619 F.3d 505, 512 (5th Cir. 2010) (When a benefits plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the reviewing court applies an abuse of discretion standard to the plan administrator's decision to deny benefits.). Thus, where, as here,[6] "an administrator has discretionary authority with respect to the decision at issue, the standard of review [is] abuse of discretion." See White v. Life Ins. Co. of N. Am., 892 F.3d 762, 767 (5th Cir. 2018) (quoting Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., LLC, 878 F.3d 478, 483 (5th Cir. 2017) (citations omitted)). Accordingly, in reviewing Unum's decision to deny Wittmann's claim for long-term disability benefits, this Court is limited to determining whether Unum abused its discretion. Id.

The deference inherent in an abuse of discretion standard of review means that "no court may substitute its own judgment for

---

[6] Here, it is undisputed that the Plan vests Unum with discretionary authority to make benefits determinations.

that of the plan administrator." McCorkle v. Metro. Life Ins. Co., 757 F.3d 452, 457-58 (5th Cir. 2014) (citations omitted). Indeed, the Fifth Circuit has cautioned district courts that "they are serving in an appellate role . . . and their latitude in that capacity is very narrowly restricted by ERISA and its regulations." Id. at 456-57.

Under the abuse of discretion standard, the Court must determine whether the administrator's decision was "arbitrary and capricious." Anderson v. Cytec Indus., Inc., 619 F.3d 505, 512 (5th Cir. 2010) (per curiam). A decision is arbitrary only if made "without a rational connection between the known facts and the decision or between the found facts and the evidence." Bellaire Gen. Hosp. v. Blue Cross Blue Shield, 97 F.3d 882, 828 (5th Cir. 1996). Moreover, the Court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end." Corry v. Liberty Life Assur. Co., 499 F.3d 389, 398 (5th Cir. 2007) (quotation omitted). As a factor in determining whether Unum has abused its discretion in denying benefits, the Court must also consider Unum's conflict of interest that arises from its dual role in evaluating claims for benefits and paying benefits. See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008); see also Holland v. Int'l Paper Co. Retirement Plan, 576

25

F.3d 240, 247 n.3 (5th Cir. 2009) (noting that the Supreme Court

in Glenn "directly repudiated the application of any form of

heightened standard of review to claims denials in which a conflict

of interest is present"). The significance of this factor is

determined on a case by case basis; a structural conflict of

interest

> should prove more important (perhaps of great
> importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision,
> including, but not limited to, cases where an insurance
> company administrator has a history of biased claims
> administration. It should prove less important (perhaps
> to the vanishing point) where the administrator has
> taken active steps to reduce potential bias and to
> promote accuracy, for example, by walling off the claim
> administrators from those interested in firm finances,
> or by imposing management checks that penalize
> inaccurate decisionmaking irrespective of whom the
> inaccuracy benefits.

Glenn, 554 U.S. at 108, 117. "When a claimant . . . does not come

forward with any evidence that the conflict of interest influenced

the . . . benefits decision, the court gives this factor little or

no weight." McCorkle, 757 F.3d at 458 n.17 (citations omitted).

On the other hand, "a reviewing court may give more weight to a

conflict of interest, where the circumstances surrounding the plan

administrator's decision suggest 'procedural unreasonableness.'"

Schexnayder v. Hartford Life & Accident Ins. Co., 600 F.3d 465,

469 (5th Cir. 2010) (quoting Glenn, 554 U.S. at 118).[7]

---

[7] Wittmann asks this Court to apply a "moderately heightened level
of scrutiny," in light of Unum's conflict of interest and

Whether the administrator's decision is supported by substantial evidence is the next inquiry. <u>Anderson</u>, 619 F.3d at 512 (citation omitted) ("In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence."); <u>Truitt v. Unum Life Ins. Co. of America</u>, 729 F.3d 497, 509 (5th Cir. 2013) (where the parties did not dispute that there was substantial evidence to

---

procedural unreasonableness. To support this contention, Wittmann points to <u>Robinson v. Aetna Life Insurance Co.</u>, 443 F.3d 389, 396 (5th Cir. 2006), in which the Fifth Circuit applied a "modified abuse of discretion standard" because of the administrator's conflict of interest in serving both as the administrator and insurer under the plan. Specifically, the <u>Robinson</u> court noted that a conflicted administrator "is 'entitled to all but a modicum' of the deference afforded to unconflicted administrators." <u>Id.</u> (quoting <u>Lain v. UNUM Life Insurance</u>, 279 F.3d 337, 343 (5th Cir. 2002)). Wittmann also invokes <u>Lamanna v. Special Agents Mutual Benefits Association</u>, 546 F. Supp. 2d 261, 288 (W.D. Pa. 2008), in which the U.S. District Court for the Western District of Pennsylvania perceived within the administrative record "an inexplicable chasm between the opinions of Plaintiff's own physicians and those who performed IMEs at [the administrator's] request." The <u>Lamanna</u> court went on "to apply a moderately heightened level of scrutiny," in light of the administrator's structural conflict of interest, coupled with numerous procedural irregularities in handling the claim. <u>Id.</u> Because Unum operates under a similar structural conflict of interest and has allegedly acted unreasonably in a procedural sense, Wittmann invites this Court to apply a moderately heightened level of scrutiny in reviewing Unum's handling of her claim.

But, binding precedent post-dating <u>Robinson</u> precludes this Court from acceding to Wittmann's request. <u>See</u> <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 108 (2008); <u>see also</u> <u>Holland v. Int'l Paper Co. Retirement Plan</u>, 576 F.3d 240, 247 n.3 (5th Cir. 2009). As such, the Court will consider the conflict of interest that arises from Unum's dual role in evaluating claims and paying benefits as a *factor* in determining whether Unum abused its discretion in denying Wittmann's long-term disability claim.

support benefits decision, the court need only consider whether the plan administrator "otherwise abused its discretion" in denying benefits).[8] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Corry, 499 F.3d at 398 (citations omitted).

Given the deference this Court owes the plan administrator, Wittmann bears the burden to prove that the denial of benefits was arbitrary and capricious or that substantial evidence does not support Unum's decision. White, 892 F.3d at 770 (citing George v. Reliance Standard Life Ins. Co., 776 F.3d 349, 352 (5th Cir. 2015)); Anderson, 619 F.3d at 512-13.

## II.

Wittmann contends that Unum arbitrarily and capriciously denied her claim for long-term disability benefits because its decisions contravene the evidence, ERISA's claims-handling procedures, and Unum's own internal documents. Along the way, Wittmann repeatedly takes issue with Unum's refusal to credit

---

[8] The focus of the substantial evidence inquiry is on the plan administrator's decision; it is irrelevant to the reviewing court whether substantial evidence exists to support a plaintiff's claim. See Ellis v. Liberty Life Assur. Co., 394 F.3d 262, 273 (5th Cir. 2004) (rejecting the plaintiff's argument that substantial evidence supported her claim of total disability as "misapprehending the burden of proof under ERISA" and noting that "[w]e are aware of no law that requires a district court to rule in favor of an ERISA plaintiff merely because he has supported his claim with substantial evidence, or even with a preponderance.").

evidence favorable to her, the shifting bases for its decisions, and its structural conflict of interest. Unum counters that it did not abuse its discretion in determining that Wittmann failed to prove she is disabled because of fibromyalgia, or in providing her with 24 months of benefits due to a mental illness, because both decisions were based upon substantial evidence.

(1) *Failure to Credit Opinions of Treating Physicians & Complaints of Subjective Symptoms*

The Court first considers Wittmann's contention that Unum abused its discretion by ignoring or arbitrarily refusing to credit the opinions and medical evidence submitted her treating physicians, as well as her own subjective complaints of pain, fatigue, and concentration problems.

*a.*

At the outset, Wittmann complains that, in initially denying her claim in October of 2014, Unum wholly ignored evidence of tender point testing submitted by her physicians.[9] In providing

---

[9] According to Unum's training materials and Dr. Davis's report, tender point testing is often used to diagnose fibromyalgia. Unum's "Fibromyalgia and Chronic Fatigue Syndromes Overview" provides, in part:

> FMS is a syndrome of widespread pain, decreased pain threshold (tenderness) and other characteristic symptoms. The 1990 American College of Rheumatology Criteria for the Classification of FMS is often used for diagnoses:
> - History of widespread pain

Wittmann with "Information That Supports Our Decision," Unum's

October 3, 2014 claim denial letter states:

> The second reviewing physician agreed with the conclusion of the first reviewing physician about your functional capacity.  The following was observed:
> - You have undergone an extensive medical evaluation and testing to date with no significant abnormalities identified.
>                              . . .
> - **There has been no evidence of any tender point testing to support a diagnosis of Fibromyalgia.**  All testing has been normal.  There has been no evidence of pain behavior during any office visits.

Emphasis added.  However, Wittmann notes, on April 24, 2013, Dr.

Austin Fraser, a rheumatologist who practices in Dr. Davis's

office, reported that she exhibited tenderness over all 18 tender

---

> - Pain that occurs on both sides of the body, above and below the waist and involving the skull and vertebrae
> - Present for greater than 3 months
> - Tender points
>   - Discreet tender spots located in the skeletal muscle band
>   - At least 11 out of the 18 tender points should be present
>
> Since persons with FMS have no objective abnormalities on physical examination and no abnormalities on diagnostic testing, the diagnosis is based upon the person's subjective report and subjective response to physical examination.

Rec. Doc. 126-10 at 000095-000096.  Similarly, Dr. Davis explains in his report that tender point testing is "performed by the examining clinician placing normal pressure on the patient's body over the 18 designated points, and asking the patient to indicate tenderness or observing the patient grimace or withdraw from the painful pressure."  See Report of William E. Davis, Rec. Doc. 122-2.

points ("Fibromuscular exam: 18/18").  He also indicated that she "[a]ppears to have fibromyalgia."  Moreover, on January 3, 2014, Dr. Davis – her treating rheumatologist – reported a diagnosis of fibromyalgia and observed that she was "[t]ender over all myofascial trigger points."  Similarly, on March 21, 2014, Dr. Lizana reported that "Palpation Evaluation Revealed Tenderness in the: cervical Spine C2-C3; Thoracic Spine mid; Lumbar Spine L5, S1 and Sacro-Iliac Joint R/L."

Unum counters that its reviewing physician was correct in noting that the records of Wittmann's treating physicians do not discuss a physical examination of specific tender points and the results of palpating those areas.  Although this contention overlooks the reports of Dr. Fraser and Dr. Lizana, which do discuss the palpation of tender points, this discrepancy nonetheless appears to be one without consequence.

Notably, the administrative record reveals that Wittmann's claim was not denied because she failed to meet the diagnostic criteria for fibromyalgia.  Rather, Wittmann's claim was initially denied in October of 2014, in part, because the reviewing physicians – Dr. Smith and Dr. Bress – found no objective evidence in her medical records to support the conclusion that she could not perform her occupational duties as an attorney.

Moreover, on appeal, Dr. Bartlett explicitly recognized that, although Wittmann may have been validly diagnosed with

fibromyalgia, the relevant issue is her capacity to perform her

occupational duties.  Specifically, Dr. Bartlett stated:

> Regardless of the presence or absence of FMS, however,
> the insured's functional capacity is what matters.  FMS
> is not in and of itself necessarily a disabling diagnosis
> and many people with FMS work full-time, controlling
> their symptoms with exercise and medications.[10]

Indeed, the plain terms of the Plan required Wittmann to provide

> proof of your claim, . . . at your own expense, [which]
> must show: . . . that your sickness or injury **causes you
> to have limitations on your functioning and restrictions
> on your activities preventing you from performing the
> material and substantial duties of your regular
> occupation**.

Emphasis added.  And Unum denied her claim for long-term disability

benefits on the ground that she did not satisfy her burden of

proving that she could not perform her occupational duties as an

attorney.

In this regard, Wittmann contends that Unum acted arbitrarily

and capriciously because it credited neither the submissions of

her treating physicians, who opined that she was unable to work

---

[10] In <u>Burell v. Prudential Insurance Company of America</u>, 820 F.3d
132 (5th Cir. 2016), the Fifth Circuit addressed a similar argument
advanced by a plaintiff that an insurer committed flagrant
procedural violations by ignoring a treating physician's MS
diagnosis.  In determining that the insurer did not abuse its
discretion, the Fifth Circuit reasoned:
> Regardless of any disagreement between Prudential's
> claim reviewers, a diagnosis of MS is not sufficient on
> its own for Burell to qualify for long-term disability
> benefits under the Plan.  To qualify, Burell's MS must
> also render him "unable to perform the material and
> substantial duties of [his] regular occupation."
<u>Id.</u> at 138-39.

full-time as an attorney, nor her own subjective complaints of pain and fatigue; instead, Unum cited an absence of objective evidence to support Wittmann's functional limitations. Unum counters that it considered, but was not obliged to accept, the conclusory opinions of Wittmann's treating physicians that she was "unable to work," which were largely based upon her own subjective complaints.

Importantly, the Supreme Court has held that administrators are not required to embrace the opinions of treating physicians:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Moreover, the Fifth Circuit has instructed that "it is the role of the ERISA administrator, not the reviewing court, to weigh valid medical opinions." Killen v. Reliance Std. Life Ins. Co., 776 F.3d 303, 309 (5th Cir. 2015). Faced with arguments very similar to those raised by Wittmann, the Fifth Circuit, in Corry v. Liberty Life Assurance Co., 499 F.3d 389 (5th Cir. 2007), concluded that an administrator did not abuse its discretion by terminating benefits for a disability arising from fibromyalgia. Although the Corry court acknowledged that "the administrator did not accept

33

the opinion of [the claimant's] experts as to the disabling effects of her symptoms," it emphasized that "given the three qualified medical experts who found **no objective medical evidence of disability**, the administrator . . . was not obliged to accept the opinion of [the claimant's] physicians." Id. at 401 (emphasis added). Courts in the Fifth Circuit have also recognized that a "plan administrator does not abuse its discretion by making a reasonable request for some objective verification of the functional limitations imposed by a medical . . . condition." Dudley v. Sedgwick Claims Mgmt. Servs., 495 F. App'x. 470, 475 (5th Cir. 2012) (quoting Anderson v. Cytec Indus., 619 F.3d 505, 514 (5th Cir. 2010) (per curiam)); see also Foster v. Principal Life Ins. Co., 280 F. Supp. 3d 871, 901-02 (E.D. La. 2017) (Brown, J.) ("[W]hile Foster's complaints of headaches were 'subjectively affecting [her] functionality,' no objective or clinical evidence was presented to demonstrate that Foster was functionally impaired by the headaches . . . . Principal did not abuse its discretion in concluding that Foster was not functionally impaired as a result of the headaches."); Keller v. AT&T Disability Income Plan, 664 F. Supp. 2d 689, 702 (W.D. Tex. 2009) ("Furthermore, Sedgwick did not abuse its discretion when it did not take Keller's pain into account because there was no objective evidence in Keller's medical

records proving that the pain would prevent her from performing her job duties.").[11]

In this case, Unum's reviewing physicians indeed considered the opinions of Wittmann's treating physicians – Dr. Cruz, Dr. Davis, and Dr. Chester - that Wittmann's complaints of pain and fatigue impaired her ability to concentrate and precluded her from working as an attorney.[12]  They simply found that those opinions

---

[11] As to her contention that Unum abused its discretion by relying on an absence of objective evidence to support her functional limitations, Wittmann invokes Torgeson v. Unum Life Insurance Co., 466 F. Supp. 2d 1096 (N.D. Iowa 2006).  In Torgeson, the U.S. District Court for the Northern District of Iowa determined that Unum abused its discretion by "demanding objective medical evidence to support [the claimant's] fibromyalgia and chronic fatigue conditions . . . and limitations imposed by those conditions" and "by rejecting the opinions of [] treating physicians concerning appropriate restrictions and limitations and, instead, relying on the opinions of reviewing physicians that her restrictions and limitations were not supported by the record." Id. at 1131-32.
      Wittmann's reliance on Torgeson is misplaced because the Fifth Circuit has held that an administrator does not abuse its discretion in crediting the opinions of reviewing physicians that no objective medical evidence supports the purported disabling effects of a claimant's fibromyalgia.  See Corry, 499 F.3d at 401.
[12] Dr. Cruz, Wittmann's internist, provided an Attending Physician Statement, in which he reported: "[A]s of this time she is unable to perform her job.  I am not able to predict when she may resume usual employment."
      Dr. Davis, Wittmann's treating rheumatologist, opined that Wittmann "has chronic pain and fatigue that likely impair her ability to focus for 8 hours on complicated issues."  In response to additional questions posed by Dr. Smith, Dr. Davis stated that Wittmann's fatigue and musculoskeletal pain precluded her return to work.  However, he indicated that he had placed no work restrictions on Wittmann and was unaware of any objective data supporting her alleged cognitive deficits.  He also noted that neuropsychological testing and a functional capacity assessment should be considered.

were unsupported by objective medical evidence.  In addition, Unum's physicians affirmatively reached out to Wittmann's treating physicians in an attempt to understand the bases for their opinions.  In initially reviewing Wittmann's claim, Dr. Smith reached out to Dr. Davis and Dr. Cruz, and on appeal, Dr. Bartlett contacted Dr. Chester.[13]  Because the opinions of Wittmann's

---

Similarly, Dr. Chester, Wittmann's psychiatrist, stated: "I do not believe she has the capacity to function in her job as a lawyer because of fatigue, pain and lack of ability to concentrate."

[13] In contending that Unum failed to apply an appropriate level of scientific analysis to the review of her medical information, Wittmann alleges that Unum violated the following principles set forth in the "Medical Information and Resources" section of the Unum Benefits Center Claims Manual:

- An opinion from an AP/HCP [Attending Physician/Health Care Provider] with a higher level of expertise, specialization or training is generally more persuasive than the opinion from a provider with a lesser level of expertise, specialization or training.

- The claim file should include the rationale for why, or why not, alternative sources of information gathering were pursued.

See "Medical Information and Resources," Rec. Doc. 132-7.

Specifically, Wittmann contends that Unum's internists failed to credit the opinions of her treating rheumatologists – Dr. Davis and Dr. Niewold – who had more expertise respecting fibromyalgia. In this regard, Wittmann overlooks that Dr. Cruz – an internist – submitted an Attending Physician's Statement in which he reported: "As of this time she is unable to perform her usual job.  I am not able to predict when she may resume usual employment."  To the contrary, Dr. Davis initially reported that he was "uncertain" as to whether Wittmann could perform the duties of her occupation full-time and later stated that he was providing her with no specific work restrictions.  And Dr. Niewold did not opine on her functional capacity whatsoever.

In a similar vein, Wittmann submits that Unum declined to undergo a thorough assessment of her subjective symptoms as contemplated by the "Evaluation of Subjective Symptoms" section of

treating physicians did little more than repeat what she had told them – that her pain and lack of focus prevented her from working – Unum's physicians were not obliged to accept their opinions. See Love v. Dell, Inc., 551 F.3d 333, 337 (5th Cir. 2008) ("ERISA does not require the opinions of treating physicians to be preferred over those of other physicians reviewing a file; ERISA merely requires that the opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken in account in an administrator's determination."); see also Stiltz v. Metro. Life Ins. Co., No. 1:05-CV-3052-TWT, 2006 U.S. Dist. LEXIS 65394, at *44 (N.D. Ga. Aug. 30, 2006) ("Based on the record, it appears that [the treating physician's] opinions of the Plaintiff's capabilities and his disability status are based

_____

the Claims Manual, which directs Unum employees to evaluate reports of subjective symptoms in the following manner:
1. obtain sufficient information to assess the claimant's reported symptom(s);
2. assess the validity of the reported symptom(s) by determining if:
- the reported symptom is consistent with the underlying medical signs and/or diagnos(es);
- the symptom's reported effect on physical/emotional/cognitive functioning is consistent with other relevant factors; and
3. determine if any restrictions on activities, particularly work-related activities, are consistent with supported limitations on function.
Once again, the record reflects that Unum indeed considered Wittmann's subjective complaints of pain but noted that the "absence of data or testing showing impairment from fatigue, weakness, or cognitive deficits" precluded a finding that she could not perform her occupational duties on a full-time basis. See Appeal Letter dtd. May 29, 2015.

primarily on the Plaintiff's diagnoses and subjective complaints. Absent any corroborating objective evidence, this is insufficient to establish that the Plaintiff's illnesses prevent him from performing the duties of his occupation.").

Moreover, Unum's determination on May 29, 2015 that Wittmann was not impaired from symptoms of fibromyalgia was based upon "more than a scintilla of evidence" – namely, its reviewing physicians' observations regarding the following evidence in the record:

- Dr. Chester's only support for concluding that Wittmann's chronic pain and fatigue had seriously impacted her concentration and ability to remember details was that she had missed two appointments with his office.

- The records contained no test data to support cognitive deficits.

- Dr. Davis acknowledged that there was no objective data in the medical records to validate Wittmann's report of cognitive issues, although he recommended a functional capacity assessment and neuropsychological testing.

- There were no notations regarding *observed* evidence of pain, fatigue or cognitive issues during extensive evaluations at the Mayo Clinic or with local specialists; rather, notes from Wittmann's physical exams described her to be "cheerful," looking "healthy," and "very comfortable."[14]

---

[14] Although Wittmann criticizes Unum for using her attempts to maintain a positive attitude against her, she overlooks that Unum's own training materials required it to consider whether her alleged limitations were supported by observation. Specifically, Unum's "Fibromyalgia and Chronic Fatigue Syndromes Overview" instructs Unum personnel to consider, among other things, whether the restrictions and limitations provided by the Attending Physician are "reasonable and supported by observation, physical

Furthermore, in upholding its decision on May 29, 2015, Unum offered to consider the results of neuropsychological testing Wittmann had undergone if such results were submitted within 30 days. In his report, Dr. Michael Chafetz, a neuropsychologist, explained that the testing showed generally intact abilities despite high variability within domains. For example, Wittmann demonstrated varying attentional abilities but showed strong attention and concentration on tasks that have a "high requirement for sustained attention and concentration." Her executive abilities and problem solving were also reported to be strong, and she showed quick and agile processing speed. Although Wittmann's memory processes were variable, she exhibited no memory dysfunction. Dr. Chafetz further reported that Wittmann's occasional attentional lapses could be, at least in part, attributable to her prior history of ADHD. Dr. Chafetz also noted that she was fatigued and suffering from depression; he believed that the poor sleep itself likely exacerbated her pain condition and depressive symptomology, making her more distractible. Ultimately, he opined that Wittmann's "reported memory and concentration problems, and problems with 'disconnecting' [we]re not borne out by testing or a history of neuropathology." After referring these test results to Dr. Bartlett and Dr. Zimmerman,

---

examination, and/or diagnostic testing." Rec. Doc. 126-10 at 000099-000100.

Unum's reviewing psychologist, who concluded that the "totality of the information indicated a psychological contribution inclusive of depression and somatic focus but not impairment," Unum upheld its decision once again on July 20, 2015.

Accordingly, the Court finds that Unum did not abuse its discretion in requiring some objective evidence of Wittmann's functional limitations or in upholding its decision when neuropsychological test results did not corroborate her reported concentration problems. See Dudley, 495 F. App'x. at 475 ("Without objective evidence of Plaintiff's limitations, the plan administrator had no way to determine whether [her] concentration was impaired to the point that [she] could not perform [her] job.") (internal citations omitted); Foster, 280 F. Supp. 3d at 901-02; Keller, 664 F. Supp. 2d at 702.

(2) Failure to Consult with Rheumatologist During Appeals

Wittmann next alleges that Unum violated an ERISA procedural regulation by failing to consult with a rheumatologist in reviewing her claim on appeal. Section 2560.503-1(h)(3)(iii) of Title 29 of the Code of Federal Regulations provides:

> [I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the named fiduciary shall consult with a health care professional who has appropriate training and experience **in the field of medicine** involved in the medical judgment.

Emphasis added. Wittmann contends that, because her claim was for a physical disability caused by a rheumatic condition – that is, fibromyalgia – Unum was required to consult with a rheumatologist in deciding her appeals. Instead, in conducting the first appeal review, Unum consulted with Dr. Bartlett, an internist. And in reviewing her second appeal, Unum consulted with Dr. Jana Zimmerman, a psychologist. Accordingly, Wittmann submits, Unum violated a clear mandate of law.

Notably, Wittmann points to no case law to support the proposition that § 2560.503-1(h)(3)(iii) requires a plan administrator to consult with a specialist in conducting an appeal review. To the contrary, courts have noted that "[t]his regulation is not so hyper-technical . . . that it requires a medical diagnosis by [one type of] specialist to be reviewed by another equally credentialed specialist." See Larque v. SBC Commc'ns Inc. Disability Income Plan and Core, Inc., No. SA-04-CA-0883-XR, 2005 U.S. Dist. LEXIS 35263, at *23 n.13 (E.D. Tex. Dec. 14, 2005). During the first appeal review, Wittmann's file was reviewed by Dr. Bartlett, who is board certified in Family Medicine. As previously discussed, Dr. Bartlett indicated that Wittmann's condition may well meet the diagnostic criteria for fibromyalgia but recognized that fibromyalgia is not necessarily a disabling diagnosis in and of itself.

Nonetheless, Wittmann contends that Dr. Bartlett was not qualified to review her medical records because he erroneously noted that her "complaints of pain, fatigue and cognitive problems" were not in "proportion" to "diagnostic tests and lab studies in the file." According to Unum's own training materials pertaining to fibromyalgia, Wittmann submits, no such diagnostic tests and lab studies exist for fibromyalgia:

> Since persons with FMS have no objective abnormalities on physical examination and no abnormalities on diagnostic testing, the diagnosis is based upon the person's subjective report and subjective response to physical examination."

See "Fibromyalgia and Chronic Fatigue Syndromes Overview," Rec. Doc. 126-10 at 000095-000096. In a similar vein, Wittmann contends, Dr. Davis's expert report sheds lights on the profound lack of understanding of fibromyalgia demonstrated by Unum in its claims decisions. For instance, Dr. Davis explains:

> The tests done to support a diagnosis of fibromyalgia are those tests needed to exclude a peripheral cause of the patient's pain. The physical examination is [sic] should be normal except for tenderness out of proportion to physical abnormalities.

See Report of William E. Davis, Rec. Doc. 122-2 at p. 2. In so arguing, Wittmann overlooks that Dr. Bartlett's report opined on whether her symptoms were impairing – not on whether fibromyalgia was a proper diagnosis. See Hysick v. Reliance Standard Life Ins. Co., No. A-04-CA-176LY, 2006 WL 8431990, at *14 (W.D. Tex. Dec. 18, 2006) (rejecting claimant's argument that administrator was

required to consult with a specialist in each area of her diagnoses where reviewing physician "did not opine as to the validity of [her] diagnoses" and instead "focused on whether or not her symptoms were impairing").

Moreover, Unum's training materials pertaining to fibromyalgia also emphasize the importance of "focusing on the impact of the claimant's functioning rather than the diagnosis itself." See "Fibromyalgia and Chronic Fatigue Syndromes Overview," Rec. Doc. 126-10 at 000098. Notably, Unum stated in its May 29, 2015 appeal letter that "[w]hile there is no definitive test for the presence or absence of fibromyalgia, there is neuropsychiatric testing available which can quantify both cognitive deficits and the presence or absence of psychiatric conditions." As previously discussed, Wittmann had neuropsychological testing performed by Dr. Chafetz, a practitioner of her own choosing, after he which he opined that her "reported memory and concentration problems, and problems with 'disconnecting' [we]re not borne out by testing or a history of neuropathology." Because Wittmann has not demonstrated how Dr. Bartlett's lack of specialized knowledge compromised the administration of her claim, she has failed to establish a procedural violation on this basis.

The second administrative appeal of Wittmann's claim amounted to a review of Dr. Chafetz's neuropsychological test results to

determine whether Wittmann exhibited cognitive deficits. As such, Unum reasonably consulted with a psychologist, Dr. Jana Zimmerman, to perform this review. Wittmann's contention that Unum was required to have a rheumatologist review the results of Wittmann's neuropsychological evaluation performed by a neuropsychologist is unpersuasive. Accordingly, the Court finds no procedural unreasonableness associated with Unum's failure to consult with a rheumatologist during the appeal review process.

(3) *Mental Illness Disability Benefits: Refusal to Credit SSA's Disability Determination & Failure to Comply with ERISA Regulations*

Wittmann next takes issue with Unum's January 24, 2017 decision to award her mental illness disability benefits based on depression, payable for 24 months. She contends that, in so doing, Unum (1) arbitrarily refused to credit the Social Security Administration's disability determination, and (2) failed to comply with two ERISA claims-handling regulations.

*a.*

The Supreme Court had held that an ERISA administrator's failure to acknowledge an SSA determination is a factor to consider in determining whether the denial of benefits was an abuse of discretion. See Glenn, 554 U.S. at 108. In a similar vein, the Unum Benefits Center Claims Manual provides that "the SSA's judgment that a claimant is disabled will weigh heavily in the claimant's favor as we make our own disability determination under

the applicable company policy" and that "any decision which is contrary to the SSA award requires a well-articulated reason supported by the facts." See "Social Security Significant Weight," Rec. Doc. 132-4 at p. 1.

After receiving a favorable disability determination from the SSA, Wittmann asked Unum to reconsider its decision, and Unum agreed to do so. She then provided Unum with a disability award letter from the SSA, which did not state the basis for the award, and a copy of a "Consultative Psychological Evaluation" conducted by Dr. Fowler, a psychologist. In his report, Dr. Fowler indicated that he had performed a Mental Status Evaluation, and he noted diagnoses of Major Depressive Disorder and Anxiety NOS. As to her functional capacity, Dr. Fowler opined:

> Given the cognitive demands of her profession, it does seem that she would currently have some difficulty performing work related tasks, including ability to focus, read, retain, analyze, and recall information. Complaints of lowered energy, pain, and fibromyalgia may render her unable to perform even simple job tasks in a stable, reliable manner.

Wittmann contends that Dr. Fowler's report can only lead to one conclusion – that she is disabled due to symptoms of fibromyalgia. Accordingly, she submits, Unum arbitrarily refused to credit the findings contained within this report by concluding that she received SSDI benefits because of a mental illness.

The Court disagrees that Unum abused its discretion in making this determination. Rather, the Court finds that it was reasonable

for Unum to conclude that Dr. Fowler's report supported the SSA's issuance of disability benefits on the basis of a mental illness. As previously discussed, the SSA award letter does not identify the reason that benefits were awarded. And the consultative report, which supports the SSA's disability determination, was prepared by a psychologist, to whom Wittmann was referred "to assess a claim for disability due to depression and fibromyalgia," and who noted diagnoses of depression and anxiety. Indeed, if the SSDI benefits were based upon Dr. Fowler's remarks concerning fibromyalgia, the SSA relied upon an opinion that a psychologist is not qualified to give. See Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) ("[T]he psychologists largely based their determination that [the claimant] could not work on their analysis of [her] physical ailments. Since this is indeed beyond their expertise as psychologists, the ALJ did not err when he disregarded their opinions for this reason.").

In a similar vein, Wittmann complains that Unum's decision to award mental illness disability benefits was not based upon substantial evidence. She contends that this determination wholly ignored that (1) she has never claimed to be disabled due to any mental illness, (2) no medical professional has concluded she is disabled due to any mental illness, and (3) Unum's own reviewing psychologist, Dr. Zimmerman, determined that Wittmann did not suffer any psychiatric impairment from depression. The Court finds

46

that Unum's January 2017 decision did not amount to an abuse of discretion on any of these bases. As to the first proposition, Wittmann does not explain how the fact that she never claimed to be disabled due to a mental illness assists her cause. Pursuant to the Plan, "[t]he lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months." The Plan further defines "mental illness" to include "psychotic, emotional or behavioral disorders" and "disorders relatable to stress." The Plan does not, however, require Wittmann to claim a mental disorder. See Bistany v. Reliance Standard Life Ins. Co., 55 F. Supp. 3d 956, 966 n.7 (S.D. Tex. 2014). Second, while Wittmann contends that no medical professional ever concluded that she is disabled due to a mental illness, she overlooks that she provided Unum with evidence regarding her mental health diagnoses:

- Dr. Chester, Wittmann's treating psychiatrist, noted a diagnosis of Somatic Symptom Disorder with predominant pain, persistent;

- Dr. Chafetz, a neuropsychologist, listed "Depressive Disorder" as a diagnostic consideration;

- Dr. Fowler, a psychologist, performed a mental status examination and diagnosed Wittmann with (1) Major Depressive Episode, (2) Anxiety NOS, and (3) Rule out pseudo-dementia secondary to depression.

Third, in emphasizing that Unum's own Dr. Zimmerman determined that Wittmann was not impaired from depression, Wittmann misconstrues Dr. Zimmerman's *overall* impression regarding Dr. Fowler's report – namely, that the limited information

47

available to Dr. Fowler was not sufficient to support his "psychiatric diagnostic impressions or [for him to] rule in or out cognitive impairment from pseudo-dementia or any other [behavioral health] **or physical etiology**." (emphasis added). Accordingly, had Unum relied upon Dr. Zimmerman's opinion, as Wittmann suggests it should have done, Unum would have determined that Wittmann exhibited impairment from neither a mental nor a physical disorder.

Finally, Wittmann repeatedly takes issue with Unum's failure to recognize that depression was a *symptom* of her fibromyalgia. In an attempt to bolster this position, she points to Unum's training materials pertaining to fibromyalgia, which explain that many people "report they are depressed as a result of their Fibromyalgia symptoms." Actually, those training materials provide that fibromyalgia "is often associated with other co-morbid conditions and symptoms such as . . . anxiety [and] depression" and that many people "report they are depressed as a result of their Fibromyalgia symptoms." See "Fibromyalgia and Chronic Fatigue Syndromes Overview," Rec. Doc. 126-10 at 000099. This resource also provides that, "when assessing functional impairment," Unum personnel are to consider whether the individual has "a co-morbid condition that may impact recovery." Id. at 000099-000100. Accordingly, while it is true that depression *can* result from fibromyalgia, the training materials make clear that,

where the claimant's depression affects her ability to work, recovery may be limited.

<i>b.</i>

Wittmann next contends that Unum violated two ERISA procedural regulations in rendering its January 24, 2017 decision to grant her mental illness disability benefits. Section 2560.503-1(h)(4)(ii) provides that, "before the plan can issue an adverse benefit determination on review on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale." 29 C.F.R. § 2560.503-1(h)(4)(ii). Wittmann alleges that Unum violated this regulation by applying the mental illness limitation on appeal without giving her prior notice of that new rationale. She submits that Unum's January 24, 2017 decision, "without question," constitutes an "adverse benefit determination" because it stigmatizes her as having a "mental illness," and provides limited short-term benefits, rather than long-term benefits through her expected retirement age. Under the circumstances of this case, the Court finds that it is arguable as to whether the January 24, 2017 decision constitutes an "adverse benefit determination." Indeed, Unum had already made an adverse benefit determination on Wittmann's claim by determining that she was not entitled to receive any benefits under the Plan, and then upholding that decision during two rounds of appeals. Accordingly, in

rendering its January 24, 2017 decision, Unum awarded disability benefits to Wittmann to which she had previously been determined not entitled to receive.

Wittmann also claims that Unum violated § 2560.503-1(j)(6)(i)(B), which requires an adverse benefit determination regarding disability benefits to provide "an explanation of the basis for disagreeing with or not following . . . [t]he views of medical . . . experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination." 29 C.F.R. § 2560.503-1(j)(6)(i)(B). Wittmann correctly notes that Unum's January 24, 2017 letter does not mention its own psychologist's opinion that Wittmann did not suffer from any psychological impairment or explain the basis for disagreeing with or not following that opinion. Unum clarifies in its papers that, based on Dr. Fowler's failure to review Wittmann's medical records, Unum's psychologist felt that he did not have a sufficient basis for rendering an opinion regarding Wittmann's alleged impairment. Unum contends that it nonetheless gave substantial weight to the SSA disability award, which it believed was based on Dr. Fowler's diagnoses of depression and anxiety. As previously noted, because Unum had already made a final determination that Wittmann was entitled to no benefits under the Plan, § 2560.503-1(j)(6)(i)(B) too appears not to apply to Unum's January 24, 2017 decision. Accordingly, the Court finds that

Unum's failure to adhere to the two aforementioned ERISA procedural regulations was not unreasonable.

*(4) Failure to Provide Relevant Documents & Inadequate Claim File Documentation*
*a.*

Wittmann next argues that Unum failed to provide her with all information and documents relevant to her claim, despite repeated requests. Section 560.503-1(h)(2)(iii) of Title 29 of the Code of Federal Regulations requires a plan administrator to provide, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." Section 560.503-1(m)(8)(i)-(iii), in turn, defines relevant information as that which "[w]as relied upon in making the benefit determination;" "[w]as submitted, considered, or generated in the course of making the benefit determination;" or "[d]emonstrates compliance with the administrative process and safeguards required" by ERISA. 29 U.S.C. § 560.503-1(m)(8)(i)-(iii). Wittmann argues that Unum violated the requirements of § 560.503-1(h)(2)(iii) by failing to provide her with information regarding communications with or among counsel until after she prevailed on a motion to compel discovery, and by waiting until February of 2018 to provide her with a copy of its Claims Manual.

Unum counters that, by letter dated September 14, 2017, Wittmann's counsel requested a number of documents and that the

Manual was not among the items enumerated.  Rather, Unum submits,
Wittmann first requested the Manual in discovery propounded on
January 22, 2018, to which Unum complied on February 23, 2018.  In
response, Wittmann notes that Unum nonetheless did not provide
"many of the requested documents" until after she prevailed on a
motion to compel.  Because Wittmann points to no evidence to
support a finding that Unum failed to provide her with relevant
information and documents in contravention of § 560.503-
1(h)(2)(iii), the Court places little weight on the parties' back-
and-forth about Unum's production of documents.

*b.*

In a similar vein, Wittmann submits that Unum violated the
"Claim File Documentation" section of the Unum Benefits Center
Claims Manual by failing to include in her claim file the substance
of relevant discussions and communications regarding her
disability claim.  This section of the Claims Manual provides:

> [D]ocumentation of conversations (telephone calls,
> resource consultations, etc.) should capture key
> statements and conclusions from the conversation which
> include:
> - the date and time the conversation took place;
> - the names of the parties involved in the
>   conversation;
> - details of the conversation, as well as any
>   follow-up items or required actions; and
> - references to the applicable policy provisions
>   discussed.

See "Claim File Documentation," Rec. Doc. 132-2 at p. 2.  For
example, Wittmann contends, the administrative record alludes to

52

the *occurrence* of three forum discussions during 2014 regarding the merits of her claim but fails to document the "key statements and conclusions" that led to the consistent finding that "available documentation does not readily support EE's inability to work." But, a review of the administrative record reveals that each discussion highlighted by Wittmann is documented by a two-page summary replete with details about the date and time each conversation took place, the names of the parties involved, key statements and conclusions made, and the next steps that would be taken.[15] Although these summaries do not explicitly reference the applicable policy provisions discussed, it is clear that these

---

[15] For instance, the record documents a CVM ("Clinical-Vocational-Medical") forum discussion conducted on June 25, 2014 and completed at 9:47 a.m. During this discussion, named participants noted that: (1) "available documentation does not readily support EE's inability to work," (2) "[a]dditional medical records are pending (Mayo Clinic) and are needed for review," and (3) the DBS ("Disability Benefit Specialist") is "to follow-up on the requested records (Mayo Clinic and Ochsner Medical Center)" and that "[a]dditional action will be determined upon receipt of the requested medical information."

The two other forum discussions Wittmann references are documented in a similar manner. Documentation pertaining to the July 8, 2014 forum discussion notes that Unum had received medical records from Wittmann's chiropractor but was still waiting on records from the Mayo Clinic and Ochsner. And notes from the July 31, 2014 discussion indicate that the documentation received showed that Wittmann had "undergone extensive testing and work up to determine a cause for [her] claimed symptoms," all of which had been negative and that her file would be referred to an OSP ("On-Site Physician") to contact Dr. Cruz. It was also noted that the Disability Benefit Specialist would send an APQ ("Attending Physician Questionnaire") to Dr. Davis and that Unum would contact the offices of Dr. Glade, Dr. Friedman, and Dr. Wilklow to confirm the last dates of treatment.

forum discussions concerned Wittmann's ability "to perform the material and substantial duties of [he]r regular occupation."

Wittmann also challenges the absence of details concerning a discussion of whether she was covered under the Unum policy. In this regard, the administrative record reflects that, on August 21, 2014, the Disability Benefit Specialist sought a legal opinion from H. Austin Pedigo, an in-house attorney, to determine the date coverage was effective for Wittmann under the policy. Pedigo responded on August 28, 2014 that the issue would be discussed with the legal issues group. Although the record does not identify the participants in the legal issues group or contain minutes from that meeting, it does capture Pedigo's response to the Disability Benefit Specialist's coverage inquiry. Specifically, on December 5, 2014, Pedigo opined that Wittmann was covered under the policy because the purpose of the "Continuation of Coverage" provision was to ensure no loss of coverage due to the transfer in carriers.

Wittmann next spotlights Unum's failure to discuss the results of its surveillance conducted in July of 2017. To further assess the extent and nature of Wittmann's functional limitations, Unum retained an independent investigator to surveil her on two weekdays from the early morning through the afternoon hours. According to the investigator's report, Wittmann was observed receiving a package from a delivery person while standing in her doorway and walking onto her patio to move furniture pillows. It

was also noted that Wittmann did not leave her residence during either surveillance period. However, Unum's July 31, 2017 decision letter denying her claim for benefits beyond 24 months for a disability unrelated to mental illness fails to mention this surveillance. According to Wittmann, Unum's failure to divulge the results of its surveillance evidences that it did not fairly review her claim or thoroughly evaluate how her symptoms might affect her job performance. In its defense, Unum argues that it was not required to describe the results of the surveillance because they were inconclusive and not relied upon as a basis for its benefit determination. Although the Court recognizes that it would have been provident of Unum to address the surveillance results in its decision letter, the Court nonetheless finds that its failure to do so did not compromise the administration of Wittmann's claim.

*(5) Unum's Conflict of Interest*

Finally, the Court considers the impact of Unum's conflict of interest on its handling of Wittmann's long-term disability claim. See Schexnayder, 600 F.3d at 469-71. It is undisputed that Unum operates under a structural conflict of interest by both determining eligibility for benefits and paying for the benefits it determines are owed. Accordingly, a decision to pay benefits affects Unum's bottom-line. In an attempt to demonstrate that this conflict affected the administration of her claim, Wittmann

55

notes that Unum's performance bonus system incentivizes its employees to deny benefits. To support this proposition, Wittmann directs the Court's attention to Unum's "Total Compensation FAQs," which provide, in part:

> Whether there is a payout AND the amount of the payout depends on: Corporate Performance and Business Performance. A corporate earnings threshold is the primary source of funding for the [performance bonus]; therefore, the Corporation must achieve this threshold in order for there to be a payout.

Wittmann also points to the deposition testimony of H. Austin Pedigo, an Unum in-house attorney involved in the administration of her claim, in which he attests that performance bonuses comprise roughly 20% of his annual income. But, this evidence does little more than reinforce that a conflict exists by virtue of Unum's dual role in evaluating claims and paying benefits.

Wittmann also calls attention to handwritten "work notes" taken by Pedigo during a legal issues group meeting, which include a reference to the law firm of Stone Pigman Walther Wittmann years before she retained the firm to handle her ERISA review. According to Wittmann, her estranged husband is a member of Stone Pigman. Although the Court recognizes that a discussion of Stone Pigman bears no relevance to Wittmann's disability claim, the Court also notes that Wittmann has not indicated how a notation regarding her husband's prominence in the legal community would adversely affect the handling of her claim. To the contrary, common sense suggests

that flagging Wittmann as a high-profile claimant would incentivize Unum to more carefully administer her claim.

Finally, Wittmann contends that the shifting bases Unum has advanced for its various decisions is probative of a claims administration "aimed more at denying or limiting" benefits." In her supplemental memorandum, Wittmann alleges that Unum's justifications for its denials evolved from "no evidence of tender point testing" (October 3, 2014) to she "may have fibromyalgia" but is not disabled (May 29, 2015) to she has a "mental illness disability" but "there is no evidence for any physical/organic medical problems which would preclude full-time Sedentary work" (January 24 and July 31, 2017).

But, after carefully reviewing the administrative record, the Court finds that the bases for Unum's decisions changed because Wittmann submitted new information for the administrator's consideration during each appeal review. In other words, a "case-specific" review of the administrative record reveals that Unum's conflict of interest was "outweighed by the substantial evidence supporting [Unum's] decision[s]." Truitt, 729 F.3d at 513-15; see also Avena v. Unum Life Ins. Co. of Am., No. 13-5947, 2015 U.S. Dist. LEXIS 49598, at *12-13 (E.D. La. Ap. 14, 2015) (Milazzo, J.) ("Here too, the Court finds that Defendant gave thorough consideration to Plaintiff's claim. It had three physicians review Plaintiff's record, entertained an appeal, waited for Plaintiff to

visit a neurosurgeon before deciding, and reached out to Plaintiff's treating physician to discuss Plaintiff's condition. This Court does not find any circumstance that suggests a higher likelihood that Unum's conflict affected the benefits decision.").

The Plan requires Wittmann to provide proof that she has a medical condition that "causes [her] to have limitations on [her] functioning and restrictions on [her] activities preventing [her] from performing the material and substantial duties of [her] regular occupation." In applying for disability benefits, Wittmann was asked: "What specific duties of your occupation are you unable to perform due to your medical condition?" She responded that she was "unable to concentrate" and that "physical endurance [wa]s limited due to pain and fatigue." Thereafter, an Attending Physician Statement was provided by Dr. Cruz, her internist. When asked to list Wittmann's physical restrictions and limitations, he referred Unum to an enclosed letter, in which he stated: "As of this time she is unable to perform her usual job. I am not able to predict when she may resume usual employment." Similarly, when Dr. Davis, Wittmann's treating rheumatologist, was asked whether Wittmann was able to perform her occupational demands on a full-time basis, he indicated that he was "uncertain." However, he also noted that she had "chronic pain and fatigue that likely impair[ed] her ability to focus for 8 hours on complicated issues." Weeks later, Dr. Davis stated

that he was not providing specific work restrictions, but that Wittmann's "severe fatigue with intermittent lightheadedness, diffuse musculoskeletal pain and tenderness" precluded her from returning to work full-time. As to Wittmann's cognitive deficits, Dr. Davis indicated that he was aware of no objective data or neurological testing because such cognitive problems were patient reported. However, he also recommended that Unum consider a functional capacity assessment and neuropsychological testing.

In administering Wittmann's claim, Unum had four different medical professionals review her file, and Unum's doctors reached out to three of Wittmann's physicians to discuss her claim. Further, in upholding its decision on appeal on May 29, 2015, Unum invited Wittmann to submit additional information within 30 days because she advised that she had undergone neuropsychological testing. Importantly, Wittmann had stated that she did not dispute that she could engage in sedentary employment; rather, she asserted that she was unable to focus and concentrate due to her fatigue and pain. But, the testing she had performed by Dr. Chafetz, a neuropsychologist of her own choosing, did not support her reported "memory and concentration problems, and problems with 'disconnecting.'"

Moreover, a year after Wittmann exhausted her administrative remedies, she presented a favorable SSA disability determination to Unum and requested reconsideration. Even though Wittmann did

not disclose this information to Unum until one year after she received notice of the decision, Unum agreed to conduct an additional appeal review. Based on its review of a "Consultative Psychological Report" prepared by Dr. Fowler, a psychologist, who noted diagnoses of depression and anxiety, Unum agreed to pay benefits under the mental illness limitation, after having determined that Wittmann was entitled to no benefits under the Plan. Wittmann argues that Unum's decision to pay benefits based on a mental illness disability for 24 months was motivated by its desire to bolster its bottom line. In other words, she submits that Unum paid these benefits to appear accommodating while avoiding the more substantial financial burden of paying long-term disability benefits based on a physical disability. Unum counters, quite logically, that if it sought to bolster its bottom line, it could have simply refused to consider the SSA disability determination, or upheld its decision that Wittmann was not entitled to any benefits.

Finally, Unum invited Wittmann to submit additional information to determine her eligibility for benefits beyond 24 months for a disability attributable to a physical medical condition (fibromyalgia). After two Unum physicians – board-certified in family medicine and internal medicine, respectively – reviewed her file and found "no evidence for any physical/organic medical problems which would preclude full-time Sedentary work

from June 30, 2016 to the present," Unum refused to continue the payment of disability benefits.

Although Unum's review process was "not the paragon of procedural propriety," Wittmann has not shown that Unum's decisions were not supported by substantial evidence, or that Unum's "evaluation was so procedurally unreasonable that it warrants vacatur." See Rittinger v. Healthy Alliance Life Ins. Co., No. 17-20646, 2019 U.S. App. LEXIS 3201, at *15 (5th Cir. Jan. 31, 2019) (per curiam); Hayes v. Dearborn Nat'l Life Ins. Co., 744 F. App'x 218, 223-24 (5th Cir. 2010) (per curiam).

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion for summary judgment is hereby DENIED, and that the defendant's motion for summary judgment is GRANTED.

New Orleans, Louisiana, February 21, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE